**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

MELISSA ITALIA,

    Plaintiff,

v.

CVS HEALTH CORPORATION, et al.,

    Defendants.

Case No.: 8:26-CV-719-SDM-NHA

_____/

**JURY TRIAL DEMANDED**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**PARTIES**

1. Plaintiff, **Melissa Italia** ("Plaintiff"), is an individual residing in North Carolina. At the time of the events alleged, Plaintiff was visiting family in Florida.

2. Defendant, **CaroMont Health** ("CaroMont") is a healthcare system headquartered in Gastonia, North Carolina. At all relevant times, CaroMont employed Defendant **Jacqueline Folks, M.D.**

3. Defendant, **Jacqueline Folks, M.D.** ("Dr. Folks") is a physician licensed in North Carolina and was employed by CaroMont Health at all relevant times.



In that capacity, Dr. Folks provided medical services to patients through CaroMont's systems.

4.    Defendant, **CVS Health Corporation** ("CVS Health") is a Rhode Island corporation headquartered in Woonsocket, Rhode Island. Through CVS Pharmacy, Inc., CVS Caremark, and MinuteClinic Virtual Care, LLC, CVS Health provides retail pharmacy and telehealth services in Florida and nationwide, including through the employees and agents identified herein.

5.    Defendant, **Judy Vu Spica, R.Ph.** ("Spica") is a pharmacist licensed in Florida and was employed by CVS Pharmacy at all relevant times.

6.    Defendant **Lehem Besera, N.P.** ("Besera") was at all relevant times a nurse practitioner employed by MinuteClinic and its Virtual Care platform.

7.    Defendant **Vera Rivera, N.P.** ("Rivera") is a nurse practitioner employed by MinuteClinic at all relevant times.

8.    Defendant, **Danielle Taylor, Pharm.D.** ("Taylor") is a pharmacist licensed in Louisiana who, at all relevant times, was employed by CVS Pharmacy as a supervisory pharmacist serving in a remote capacity.

9.    Defendant, **Aldo Calvo, D.O.** ("Dr. Calvo") is a physician licensed in Florida and serves as Senior Medical Director for CVS Health.

10.    Defendant **Sarasota Memorial Hospital** ("SMH") is a public hospital facility owned and operated by the Sarasota County Public Hospital District

2

pursuant to Florida law and located in Sarasota, Florida.

11.     Defendant, **Sonal Patel, D.O.** ("Dr. Patel") is a psychiatrist licensed in Florida and affiliated with SMH. At all relevant times, Dr. Patel provided psychiatric services at SMH.

12.     **John and Jane Doe** Defendants 1–5 ("Doe Defendants") are employees, agents, or administrators of SMH whose identities are currently unknown.

## VICARIOUS AND INSTITUTIONAL LIABILITY

13.     At all relevant times, the individual Defendants acted within the course and scope of their employment or agency relationships with their respective corporate or institutional Defendants.

14.     The corporate and institutional Defendants are liable under principles of agency and vicarious liability for the acts and omissions of their employees and agents alleged herein.

15.     With respect to Plaintiff's federal constitutional claims, the corporate and institutional Defendants, including private entities alleged to have acted under color of state law, are sued only for their own acts and omissions, including policies, practices, customs, decisions, failures of oversight, and ratification that were the moving force behind the constitutional violations described herein.

16.     Plaintiff does not assert respondeat superior liability for federal constitutional claims.

**JURISDICTION AND VENUE**

17.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff asserts claims arising under the United States Constitution and federal law, including 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq.

18.     This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative fact as Plaintiff's federal claims.

19.     This Court has personal jurisdiction over all Defendants because they committed acts within Florida or purposefully directed conduct toward Florida giving rise to the claims alleged herein.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the Middle District of Florida, including Plaintiff's seizure, detention, and denial of prescribed medication.

21.     Although CaroMont Health and Folks are located in North Carolina, they created and transmitted psychiatric diagnostic entries through interoperable

electronic medical record systems accessed and relied upon in this District, causing foreseeable injury in Florida.

22. This Court may therefore exercise specific personal jurisdiction over CaroMont Health and Dr. Folks under Calder v. Jones, 465 U.S. 783 (1984). Defendants transmitted psychiatric information through interstate electronic systems with knowledge that such information would be accessed and relied upon across state lines, including in Florida in decisions affecting Plaintiff's liberty interests.

23. That psychiatric information was accessed and relied upon by providers and institutional actors in Florida and by law-enforcement officers and was used as a basis for Plaintiff's seizure and involuntary confinement.

24. This action arises from a series of acts by CaroMont Health, CVS Health, and SMH that culminated in Plaintiff's involuntary seizure and confinement under Florida's Baker Act, Fla. Stat. § 394.463. Plaintiff does not challenge the Baker Act itself or seek to impose liability for good-faith clinical or custodial determinations. Instead, Plaintiff challenges the transmission and use of psychiatric information to invoke state custodial authority without a contemporaneous clinical basis or independent law-enforcement observation establishing the statutory criteria for involuntary examination.

The events described below occurred over the course of a single day - April 27, 2024 - beginning with a routine prescription refill request and culminating in Plaintiff's involuntary seizure and psychiatric detention.

## STATEMENT OF FACTS

25.   This action arises from Plaintiff's seizure and involuntary psychiatric detention in Florida after Defendants escalated a routine medication-access request. For approximately twenty years preceding the events at issue, no treating or evaluating provider documented psychiatric instability, suicidality, impaired judgment, or any clinical basis for involuntary intervention. Plaintiff did not receive mental-health counseling during that period because no such care was indicated, and she has no criminal history.

26.   Plaintiff's prescribed medications were longstanding and medically necessary.  Although both medications are classified as "antidepressants," they were not prescribed for a mood disorder, suicidality, impaired judgment, loss of reality testing, or dangerousness.  No provider documented such conditions.

27.   Plaintiff was insured through CVS/Aetna Health. Her prescription drug benefits were administered by CVS Caremark, and CVS Pharmacy was a primary in-network retail pharmacy under the plan.

28.    Prior to the events described herein, CaroMont Health, through Plaintiff's primary care physician, Folks, entered psychiatric diagnostic codes into Plaintiff's electronic medical record without contemporaneous clinical findings establishing the diagnostic criteria for those conditions.

29.    Plaintiff exhibited no mental-health symptoms or impairment during primary-care encounters, and no findings supported those diagnoses. A true copy of the record is attached as **Exhibit A,** including correspondence from Folks, stating that the Major Depression diagnosis was taken from prior records rather than her independent evaluation.

30.    Those psychiatric labels propagated through interoperable electronic medical record systems and became accessible to CVS Health personnel, including providers operating on the CVS Virtual Care platform.

31.    CVS Health personnel accessed Plaintiff's electronic medical records and treated inherited psychiatric labels as clinical fact during Plaintiff's routine refill request without verifying their accuracy or relevance to the medication-access issue presented.

32.    Once entered, the unsupported psychiatric labels automatically propagated across institutional systems. Subsequent providers relied on them without independent assessment, perpetuating materially false psychiatric information later used in decisions affecting Plaintiff's access to

7

care and prescribed medication.

**MEDICATION ACCESS REQUEST AND CVS ESCALATION**

On April 27, 2024, within the span of several hours, Plaintiff's routine request for short-term medication continuity escalated into police seizure and involuntary psychiatric detention.

33. On the evening of April 26, 2024, Plaintiff discovered she did not have possession of two lawfully prescribed medications, each carrying warnings regarding abrupt discontinuation.

34. Plaintiff remained awake overnight and experienced physical symptoms the following morning, including dizziness, tremors, and loss of appetite. These symptoms began after interruption of her prescribed medication. Plaintiff therefore contacted CVS Pharmacy that morning seeking a short-term refill.

35. At approximately 8:35 a.m. on April 27, 2024, Plaintiff contacted the CVS Pharmacy located at 3800 Tamiami Trail in Sarasota, Florida, seeking a short-term supply of her prescribed medication to prevent worsening symptoms.

36. Defendant Judy Vu Spica, R.Ph. responded, "I do not know how to do that." Spica provided no referral or alternative means of obtaining a short-term refill despite Plaintiff explaining the physical effects of missed doses and the time-sensitive nature of the request.

37. Plaintiff contacted the pharmacy several times that morning to inquire about the status of the refill request. During one call, Spica stated, "I don't have to listen to your crap," and disconnected the call without providing assistance or an alternative means of obtaining the medication.

38. At approximately 1:00 p.m., Plaintiff went to the pharmacy in person to resolve the medication-access issue. Spica refused to engage or implement standard short-term refill options to ensure continuity of care, despite Plaintiff's explanation that she was experiencing physical symptoms from missed doses and required short-term medication continuity.

39. Plaintiff complained to CVS Director of Store Services Management, Joseph Frederick, regarding Spica's conduct. Plaintiff observed Spica watching this interaction.

40. After Plaintiff's complaint to CVS management, Plaintiff contacted CVS Virtual Care and spoke with Defendant Lehem Besera, N.P., seeking assistance in obtaining a short-term supply of medication and describing the pharmacy's failure to assist.

41. During that conversation, Plaintiff expressed frustration and stated, "Who wants to live in a world where CVS has such power over my well-being?" Defendant Besera asked whether Plaintiff was suicidal. Plaintiff immediately denied suicidal ideation and clarified that the statement was rhetorical and

should be disregarded.

42.    At all relevant times that morning, Plaintiff remained in the continuous presence of her sister and brother-in-law. Time-stamped photographs and video show Plaintiff's participation in ordinary activities with them that day, including a whale watch excursion and a visit to the Botanical Gardens. Although Plaintiff continued to experience worsening symptoms, she did not express or exhibit behavior consistent with harm to herself or others. Family members observed only physical symptoms associated with medication interruption and concern about CVS's refusal to provide routine assistance.

43.    Defendant Besera then asked to speak directly with Spica and Plaintiff provided her mobile phone to facilitate that communication.

44.    During the escalation process, Spica communicated representations portraying Plaintiff as psychiatrically unstable and in psychiatric crisis. Those representations were transmitted among CVS personnel involved in the escalation, including Besera and another nurse practitioner, and were adopted or documented within CVS systems despite the absence of any contemporaneous observation or assessment of Plaintiff by those personnel.

45.    Spica further represented that Plaintiff had described herself as "manic-depressive" and "in crisis" due to lack of medication. Plaintiff made no such statements, and those representations were not grounded in her words,

10

conduct, or any individualized assessment.

46. During approximately ninety minutes on the Virtual Care call, Besera conducted no meaningful inquiry into Plaintiff's physical condition or withdrawal symptoms, performed no assessment tied to statutory criteria, and took no steps to resolve the medication-access issue or ensure continuity of prescribed treatment before initiating custodial escalation through law-enforcement involvement.

47. While Plaintiff remained in the presence of her family and continued seeking medication continuity, CVS personnel initiated supervisory escalation and treated the refill request as a psychiatric crisis.

48. Defendants Danielle Taylor, Pharm.D., and Aldo Calvo, D.O., approved custodial escalation based on representations that Plaintiff was suicidal, homicidal, and psychiatrically unstable, without independently verifying contemporaneous statutory criteria or documenting factual support or conducting any independent assessment.

49. Taylor acted within the scope of her supervisory duties, had access to information reflecting Plaintiff's repeated requests for routine medication assistance, and approved custodial escalation without ensuring verification of contemporaneous statutory criteria or factual support.

50. Calvo, a CVS-employed physician with supervisory authority over CVS Virtual Care clinicians, including Besera, was responsible for Virtual Care escalation protocols and possessed authority to approve or halt custodial escalation.

51. Despite that authority, Calvo approved escalation based upon unsupported psychiatric characterizations without independent verification, individualized assessment, or contemporaneous statutory findings.

52. Besera accessed Plaintiff's out-of-state electronic records and relied on existing psychiatric diagnostic codes without verifying their accuracy or relevance to the medication-access request presented during the Virtual Care encounter.

53. As reflected in the CVS electronic medical record dated April 27, 2024, Besera entered diagnostic characterizations including Major Depression and Suicidal Ideation during the escalation process. At the time those entries were made, the record contains no contemporaneous documentation of intent, plan, imminence, or behavior satisfying statutory dangerousness criteria. Custody was nevertheless invoked based on those characterizations entered into the CVS record during the escalation process. A true and correct copy of the relevant entry is attached as **Exhibit B.** The entries described above appear on pages 3 and 4 of the record.

54. At 1:25 p.m., Defendant Vera Rivera, N.P., entered a clinical note in CVS's electronic medical record describing Plaintiff as being in psychiatric crisis.

55. At the time Rivera created this entry, Plaintiff had not interacted with law enforcement and was physically present at a different CVS Pharmacy location that was closing for lunch. Rivera had not examined Plaintiff, spoken with her, or conducted any independent assessment before entering a note describing Plaintiff as being in psychiatric crisis. A true and correct copy of the entry is attached as **Exhibit A.** The entries described above appear on pages 2 - 3.

56. At the time Rivera created this entry, no law-enforcement officers had arrived at any CVS location and Plaintiff had not interacted with police.

57. Plaintiff was directed to proceed to a different CVS Pharmacy location without explanation. At the time, Plaintiff understood the instruction as an attempt to resolve the medication-access issue after interaction with Spica. Plaintiff later learned the transfer was part of the escalation process.

58. At approximately 1:30 p.m., upon arriving at the alternative CVS location, Plaintiff found that the pharmacy was closing for lunch. Plaintiff provided her name to inquire whether the refill was ready. After hearing Plaintiff's name, the staff member's demeanor changed noticeably and the interaction shifted from a routine medication inquiry to a markedly alarmed

and cautious response.

59.  At that time, no law-enforcement officers had arrived or interacted with Plaintiff.

60.  Plaintiff and family were directed back to the original CVS location. After again complying with CVS's instructions, Plaintiff requested an explanation for the continued failure to dispense her medication.

61.  During this exchange, Besera asked whether Plaintiff would prefer to obtain her medication at an emergency room. In context, and given the ongoing pharmacy issues, Plaintiff understood the question to concern medication access rather than psychiatric intervention. Defendants later characterized this exchange as a "refusal" for purposes of Baker Act criteria.

62.  While in the CVS parking lot, Plaintiff's family became aware of police presence. Besera instructed Plaintiff to hand her phone to law enforcement, and Plaintiff complied. In the public parking lot, and while on speakerphone, Besera announced that Plaintiff had been diagnosed with "Major Depression" during four annual examinations. The information conveyed consisted of chart-derived psychiatric diagnoses obtained through electronic health-record systems and/or insurance claims history, without verification, individualized assessment, or direct clinical evaluation.

63. Plaintiff objected and demanded the return of her phone. Instead, Besera continued relaying psychiatric information over speakerphone despite Plaintiff's clear statement that the information was inaccurate.

64. Besera stated to Sarasota Police that Plaintiff told her she was both suicidal and homicidal. Plaintiff made no such statement. The assertion was conveyed to law enforcement as a basis for involuntary detention.

65. Defendant Besera did not execute a Baker Act certificate and did not conduct a qualifying mental-health examination before communicating assertions of suicidality or homicidality to law enforcement. The responding officers placed Plaintiff in involuntary custody in reliance on those representations and without independent clinical findings establishing statutory criteria.

66. Prior to placing Plaintiff into custody, one responding law-enforcement officer stated to his partner, in substance, "All this hearsay…," reflecting expressed doubt about the information being relayed as the basis for detention.

## LAW ENFORCEMENT SEIZURE AND HOSPITAL DETENTION

67. Plaintiff was seized and transported for involuntary examination under Florida's Baker Act based on psychiatric crisis representations transmitted by Defendants Spica and Besera, despite the absence of documented facts

15

establishing statutory criteria for dangerousness, incapacity, or inability to care for herself at the time custody was initiated.

68. Plaintiff sought routine medication-continuity assistance. Instead of providing ordinary pharmacy or telehealth services, Defendants treated unsupported psychiatric labeling as determinative, communicated false or unsupported psychiatric characterizations to law enforcement, and escalated the request into custodial intervention. Plaintiff was seized and transported for involuntary examination and, while confined, was denied access to her prescribed medication despite the absence of documented statutory criteria for detention, resulting in medication-withdrawal injury and loss of liberty.

69. After arresting Plaintiff, the same officer was captured on body-worn camera audio stating, "What the fuck, what the fuck—this better be fucking legit," reflecting the officer's expressed doubt about the legitimacy of the custodial seizure.

70. Plaintiff arrived at SMH's emergency department, informed staff that she was experiencing a medication withdrawal issue and was examined by an unidentified resident physician. During that initial encounter, the resident entered a standing order for Plaintiff's prescribed medication.

71. SMH personnel placed Plaintiff in isolation in a mental-health holding cell for approximately eight hours. During that period she received no

meaningful medical follow-up, monitoring, or intervention despite escalating physical and neurological symptoms consistent with abrupt antidepressant withdrawal.

72. After entering the standing order, the resident ignored Plaintiff's subsequent efforts to obtain medical assistance. Despite the active standing order, Plaintiff's assigned emergency-room nurse, LeeAnn Richman, R.N., did not dispense the medication.

73. During Plaintiff's confinement, Richman referred to Plaintiff as "a manipulative liar" and contacted Plaintiff's sister seeking information unrelated to Plaintiff's medical condition, withdrawal symptoms, or medication needs. The questioning focused instead on whether Plaintiff "was really a clinician."

74. When Plaintiff asked about the Baker Act process, Richman stated, "I thought you would know everything there was to know about the Baker Act," before abruptly slamming the door. This exchange was witnessed by a nurse seated at the other workstation.

75. At approximately 11:00 pm, Plaintiff was transferred from the ER to the Psychiatric Unit and engaged in the only in-person mental-health conversation of the day. The evaluation documented no suicidal ideation and confirmed that Plaintiff presented with a medication-access issue rather

than a psychiatric crisis.

76. The in-person mental-health evaluation documented no suicidal ideation, no psychiatric crisis, and no facts supporting involuntary examination. Despite those findings, Defendants continued Plaintiff's confinement, relying on previously transmitted psychiatric labels and earlier representations rather than the hospital's own clinical findings.

77. While Plaintiff remained under involuntary custodial control and unable to obtain her medication independently, SMH personnel denied her access to her prescribed medication despite known withdrawal risks and despite a standing physician order authorizing administration. When Plaintiff asked Nurse Kimberly Starry, R.N., to review the order with the physician, Starry returned and stated that Dr. Patel refused, saying, "She is not prescribing because she does not have to."

78. During confinement, Plaintiff experienced acute withdrawal symptoms including tremors, dizziness, palpitations, tinnitus, electric "brain zaps," agitation, crawling skin sensations, disorientation, and auditory distress while her prescribed medication remained withheld.

79. Plaintiff was fitted with an ankle monitoring device and placed on 15-minute "checks." Staff did not enter the room or conduct visual assessments. Instead, they scanned the ankle device from the hallway to log compliance

while Plaintiff's withdrawal symptoms escalated without medical assessment, intervention, or support.

80.   When Plaintiff paced the hallway due to escalating symptoms, Defendants threatened continued involuntary confinement if she did not remain in her room. Plaintiff immediately gestured toward the security camera, marking the moment the threat was made.

81.   A shift supervisor informed Plaintiff that she was not permitted to sit in the common area or access her eyeglasses and stated, "Your safety is not our concern." Two SMH staff members witnessed this exchange.

82.   Throughout confinement, Defendants relied on electronic presence verification rather than medical evaluation while Plaintiff remained under total custodial control and continued to experience untreated withdrawal symptoms that were repeatedly reported to staff.

83.   During this same period, SMH personnel, including Dr. Patel and participating nursing staff, withheld Plaintiff's prescribed medication and administered psychotropic medication unrelated to her presenting condition, despite contemporaneous documentation reflecting that Plaintiff presented with a medication-access issue and no suicidal ideation.

84.   The following morning, the discharge process was initiated without further clinical reassessment or additional mental-health evaluation, and while the

ankle monitoring device remained attached.

85.    Upon returning to CVS Pharmacy with the discharge prescription, Spica filled the refill for $0.69.

86.    Later that afternoon, while waiting at the airport in the presence of her brother-in-law, Besera called Plaintiff and stated, "I am so sorry."

## INJURY AND CONTINUING HARM

87.    At all relevant times, SMH was a designated Baker Act receiving facility with trained personnel responsible for conducting involuntary examinations and determining whether statutory criteria were met.

88.    During Plaintiff's confinement, hospital personnel continued to rely on previously transmitted psychiatric labels despite contemporaneous clinical findings documenting no suicidal ideation or psychiatric crisis.

89.    As a result of the events described herein, Plaintiff suffered physical and neurological injury arising from abrupt interruption of prescribed medication while under custodial control, together with emotional distress, loss of liberty, and dignitary harm during and following her involuntary confinement.

90.    As a direct and foreseeable consequence of Defendants' conduct, Plaintiff required additional medical care to evaluate and treat injuries caused by abrupt medication interruption. In subsequent encounters, inaccurate

psychiatric labels remained in her records despite requests for correction, creating ongoing barriers to treatment and access to appropriate medical care.

91. Plaintiff experienced abrupt interruption of long-term prescribed medication while under custodial control, resulting in objectively documented neurological and cognitive impairment. These deficits have persisted since the events described herein.

92. In October 2025, after persistent functional limitations following the April 2024 events, Plaintiff underwent formal neurocognitive testing. The evaluation documented cognitive impairment and noted neurological signs consistent with medication withdrawal.

93. The events described herein are reflected in contemporaneous institutional records, including CVS in-store surveillance footage, pharmacy system logs and notes, electronic medical record audit trails identifying the user and time of entries, law-enforcement body-camera recordings, and SMH surveillance and custodial records maintained in the ordinary course of business.

94. Spica and Besera communicated materially inaccurate or unsupported representations to Sarasota County law enforcement officers for the purpose of initiating custodial intervention. The responding officers documented those statements and transmitted them to SMH emergency department

personnel, who relied upon them in continuing Plaintiff's detention and restricting her access to prescribed medication.

**SUBSEQUENT RETALIATORY CONDUCT**

95.   After Plaintiff transmitted a written demand letter asserting legal violations, Plaintiff received a typewritten letter from CVS stating that "Minute Clinic will no longer be able to provide your medical care" because Plaintiff's "clinical needs require specialized services and support beyond the scope of what our practice can offer." The handwritten envelope identified the return address as CVS headquarters and was postmarked June 3, 2025, from Fairview Village, Pennsylvania. A true and correct copy of the envelope and enclosed letter is attached as **Exhibit C.**

The correspondence repeated and reinforced the same unsupported psychiatric characterizations previously entered into Plaintiff's medical record and communicated to third parties in connection with the custodial escalation described herein.

**SCOPE OF CLAIMS**

96.   Plaintiff does not challenge Florida's Baker Act or good-faith actions taken pursuant to it. This action arises from Defendants' transmission and reliance upon materially false or unsupported psychiatric information to initiate and maintain custodial authority in the absence of contemporaneous facts

satisfying statutory criteria.

97. Plaintiff does not assert claims for medical malpractice or negligent medical treatment.

98. Plaintiff alleges a limited conspiracy consisting of the coordinated fabrication, transmission, and reliance upon unsupported psychiatric information that directly resulted in Plaintiff's seizure and confinement. The existence of the agreement and concerted action is evidenced by parallel communications, contemporaneous record entries, and coordinated escalation steps undertaken by different Defendants within a compressed timeframe that resulted in the same custodial outcome.

## COUNTS

### COUNT I - 42 U.S.C. § 1983 – FOURTH AMENDMENT (UNREASONABLE SEIZURE)
(Against Defendant Lehem Besera, N.P.)

This claim arises from Defendant Besera's initiation of Plaintiff's custodial seizure and involuntary transport under Florida's Baker Act without facts sufficient to establish statutory criteria or probable cause of dangerousness.

99. Plaintiff realleges and incorporates by reference the preceding factual allegations to the extent necessary to state this Count.

100. Defendant Besera acted under color of state law by invoking statutory custodial authority under the Florida Baker Act, communicating psychiatric

crisis representations to law enforcement for the purpose of effectuating Plaintiff's seizure and transport, and jointly participating in the decision to place Plaintiff in involuntary custody. By initiating law-enforcement intervention for involuntary transport under statutory authority, Besera's conduct was fairly attributable to the State for purposes of 42 U.S.C. §1983 and constituted joint participation with law-enforcement officers in the seizure of Plaintiff.

101. Law enforcement officers relied on psychiatric representations communicated by Defendant Besera as the basis for Plaintiff's seizure and Baker Act transport. Police body-worn camera footage reflects officers stating that Plaintiff had reported being suicidal and homicidal to Defendant Besera. Responding officers did not identify independent contemporaneous facts establishing that Plaintiff satisfied Baker Act criteria and effectuated the seizure in reliance on Defendant Besera's representations.

102. As alleged in Paragraphs 66 and 70, the arresting law enforcement officer expressed concern regarding the reliability of the information supplied by Defendant Besera as the basis for detention, reflecting that the seizure was effected in reliance on her representations rather than independently observed statutory criteria.

24

103. Plaintiff did not state to Defendant Besera that she was suicidal or homicidal and did not convey intent, plan, or means to harm herself or others. Defendant Besera did not conduct a contemporaneous qualifying evaluation sufficient to generate independent statutory findings under the Florida Baker Act before communicating unsupported psychiatric crisis representations to law enforcement.

104. Defendant Besera's documentation does not reflect homicidal ideation, and the attribution of homicidal ideation appears only in law enforcement reporting. Plaintiff did not hear the term "homicidal" during her call with Defendant Besera and first became aware of that characterization only after her involuntary admission, when she reviewed written documentation reflecting that representation.

105. No independent contemporaneous statutory findings by responding officers established dangerousness to self or others. Plaintiff did not threaten harm, attempt self-injury, or engage in conduct indicative of a risk of bodily harm. Prior to initiating custodial escalation, Defendant Besera did not document objective facts sufficient to satisfy statutory criteria for involuntary detention.

106. In the absence of independently documented facts establishing imminent dangerousness, the representation that Plaintiff was suicidal or homicidal

did not provide officers with objective facts sufficient to establish probable cause for involuntary seizure under the Fourth Amendment.

107. In the absence of independently documented facts establishing imminent dangerousness, the representation that Plaintiff was suicidal or homicidal did not provide responding officers with objective facts sufficient to establish probable cause for involuntary seizure.

108. As a direct and proximate result of this unreasonable seizure, Plaintiff suffered loss of liberty, involuntary custodial transport, and the cascading injuries that followed, including acute medication withdrawal, neurological harm, and emotional distress.

109. Defendant Besera's conduct violated Plaintiff's clearly established rights under the Fourth Amendment and 42 U.S.C. § 1983, entitling Plaintiff to damages and equitable relief as permitted by law.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Besera and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) declaratory relief;

(d) costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(e) such other and further relief as the Court deems just and proper.

## COUNT II - 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT (DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS)

(This Count is asserted against Defendant Sarasota Memorial Hospital, a public hospital authority organized under Florida law, and the individual hospital personnel named herein who, while acting under color of state law, exercised statutory custodial authority pursuant to the Florida Baker Act.)

**A. Fourteenth Amendment – Unlawful Continued Civil Detention (Absence of Statutory Predicate / Arbitrary Confinement)**

**B. Fourteenth Amendment – Deliberate Indifference to Serious Medical Need During Civil Confinement**

At all relevant times, SMH acted under color of state law as a governmental entity exercising statutory custodial authority pursuant to the Florida Baker Act over Plaintiff.

SMH is a public hospital district and political subdivision of the State of Florida, subject to suit under 42 U.S.C. § 1983 for constitutional violations caused by its official policies, customs, or deliberate institutional practices and is not entitled to Eleventh Amendment immunity as an arm of the State.

110. Plaintiff realleges and incorporates by reference the preceding factual allegations to the extent necessary to state this Count.

111. The Fourteenth Amendment protects individuals from deprivation of liberty without due process of law, including continued involuntary confinement and custodial restraint absent compliance with clearly established statutory and constitutional safeguards, including the requirement that continued detention be supported by contemporaneous facts satisfying statutory criteria

27

for involuntary confinement.

112. Under Florida law, continued detention under the Baker Act requires contemporaneous facts satisfying statutory criteria. Where such criteria are not documented or are negated by subsequent clinical findings, continued custody constitutes arbitrary governmental restraint.

113. SMH acted under color of state law in exercising custodial authority pursuant to the Florida Baker Act and maintained Plaintiff's involuntary confinement despite documented findings negating statutory criteria. The continued detention occurred pursuant to institutional practices and operational protocols attributable to final policymakers that permitted confinement without verification that statutory criteria remained satisfied, and those practices were the moving force behind the deprivation of Plaintiff's liberty and resulting constitutional injury.

114. Following Plaintiff's arrival at SMH, personnel acting under color of state law exercised custodial control over Plaintiff's continued confinement, release, and access to prescribed medication pursuant to Baker Act authority despite documented findings reflecting no suicidal ideation, low suicide risk, and no facts establishing imminent dangerousness or statutory incapacity at any time during her custody.

115. During Plaintiff's custody, the only in-person examination documented no suicidal ideation, assessed low suicide risk, and identified the presentation as a medication-access issue rather than a psychiatric emergency. No subsequent findings identified facts satisfying statutory criteria for continued detention, and no written documentation established imminent dangerousness or incapacity as required for continued involuntary detention under the Florida Baker Act.

116. Despite these findings, hospital personnel continued Plaintiff's confinement in the absence of statutory criteria or any new emergent facts establishing lawful grounds for continued restraint.

117. The continued custodial restraint in the absence of documented statutory criteria or new emergent facts constituted arbitrary confinement and deprived Plaintiff of liberty without due process under the Fourteenth Amendment.

**B. Fourteenth Amendment – Deliberate Indifference to Serious Medical Need During Civil Confinement**

118. While exercising custodial control over Plaintiff, SMH and its clinical staff denied her access to longstanding, lawfully prescribed medication despite actual knowledge of the substantial risks associated with abrupt discontinuation and despite their exclusive control over her ability to obtain medication while confined. Because Plaintiff was involuntarily confined and

unable to access outside pharmacy services, she could obtain her prescribed medication only through hospital authorization. Hospital personnel had access to pharmacy resources capable of providing the medication and knowingly disregarded the substantial risk of serious harm arising from medication withdrawal despite possessing both the authority and practical ability to ensure short-term continuity.

119. Rather than providing Plaintiff's prescribed medication or a medically appropriate alternative, hospital personnel administered psychotropic medication during custody. Plaintiff did not request those medications and ingested them while confined and experiencing withdrawal symptoms. The medications were administered without documented emergent necessity or factual justification requiring their use.

120. SMH's denial of prescribed medication while exercising exclusive custodial control, and its continuation of confinement absent statutory criteria, constituted deliberate indifference to Plaintiff's serious medical needs and liberty interests because SMH and its participating hospital personnel knew of and disregarded a substantial risk of serious harm while exercising exclusive control over Plaintiff's access to care during involuntary civil confinement described in paragraphs 65 and 69.

121. With respect to SMH, the constitutional violations alleged herein were caused by official policies, longstanding institutional customs, and deliberate policymaking omissions attributable to final decisionmakers responsible for Baker Act detention and custodial medical protocols, including the failure to implement and enforce policies ensuring medication continuity during custodial detention. These institutional practices and omissions were the moving force behind the deprivation of Plaintiff's constitutional rights and establish municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).

122. These institutional omissions included failure to verify that Baker Act criteria remained satisfied before continuing confinement, failure to reconcile electronic diagnostic coding with in-person findings before maintaining custody, and failure to ensure access to prescribed medication while exercising exclusive custodial control. These omissions directly caused the continued detention and resulting constitutional injuries.

123. The foregoing acts and omissions under color of state law deprived Plaintiff of her clearly established rights under the Fourteenth Amendment and were the direct and proximate result of the official policies, customs, and deliberate institutional omissions described above, thereby entitling Plaintiff to relief under 42 U.S.C. § 1983, and establishing municipal liability under

31

Monell v. Department of Social Services, 436 U.S. 658 (1978).

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant SMH and participating hospital personnel acting under color of state law and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages against the individual Defendants to the extent permitted by law;

(c) declaratory relief;

(d) costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(e) such other and further relief as the Court deems just and proper.

**COUNT III – VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) AND**
**SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 794)**
(Against Defendant Sarasota Memorial Hospital and Defendant CVS Health Corporation)

124. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

125. The Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act prohibit discrimination against qualified individuals with disabilities, including individuals regarded as having a disability, in the provision of services, programs, or activities by public entities and entities receiving federal financial assistance. These statutes also require reasonable modifications when necessary to avoid discrimination.

32

126. At all relevant times, SMH and CVS Health regarded Plaintiff as having a disability within the meaning of the ADA and Section 504.

127. SMH is a public hospital district and therefore a public entity subject to Title II of the ADA. Upon information and belief, SMH receives federal financial assistance sufficient to subject it to Section 504 of the Rehabilitation Act. CVS Health operates pharmacy and telehealth services open to the public and is subject to Title III of the ADA as a place of public accommodation. Upon information and belief, CVS Health receives federal financial assistance in connection with its healthcare and pharmacy operations sufficient to subject those operations to Section 504 of the Rehabilitation Act.

128. SMH and CVS Health treated Plaintiff as psychiatrically unstable based on unsupported psychiatric labeling rather than conducting an individualized assessment of actual risk, capacity, or medical necessity. Instead of addressing a routine medication-access issue through ordinary pharmacy and hospital procedures, CVS Health personnel initiated and participated in the escalation of the encounter into custodial intervention. CVS Health personnel initiated and contributed to this escalation by communicating unsupported psychiatric concerns to responding authorities rather than providing routine pharmacy or telehealth assistance available to similarly

33

situated customers.

129. SMH and CVS Health acted by reason of Plaintiff's perceived psychiatric impairment. Unsupported labeling was treated as determinative of Plaintiff's credibility and risk status, displacing neutral evaluation and ordinary service protocols available to individuals not perceived as psychiatrically impaired.

130. As a result, SMH and CVS Health denied Plaintiff the benefits of their services on equal terms, including ordinary pharmacy assistance, telehealth consultation, prescription verification, medication continuity, and non-custodial hospital evaluation procedures. Individuals not perceived as psychiatrically impaired were not subjected to law-enforcement escalation or custodial control under comparable circumstances.

131. Reasonable measures were readily available to resolve the issue, including verification of prescription history and short-term medication continuity. Those steps required no change to SMH's and CVS Health's services and posed no safety concern. Rather than provide routine assistance, SMH and CVS Health escalated the encounter to custodial intervention involving law enforcement. Plaintiff later obtained the needed medication at nominal cost, confirming that custodial escalation bore no reasonable relationship to the underlying issue.

132. SMH and CVS Health documented no contemporaneous, independently observed conduct establishing imminent risk sufficient to justify custodial intervention. Absent the perceived psychiatric impairment, Plaintiff would have received routine assistance without law-enforcement involvement or custodial restraint in connection with her medication request.

133. SMH's and CVS Health's actions constituted intentional discrimination and failure to provide reasonable modifications in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

134. As a direct and proximate result of SMH's and CVS Health's conduct, Plaintiff was denied ordinary services, subjected to custodial control, deprived of access to prescribed medication, and suffered physical injury, neurological harm, emotional distress, loss of liberty, and dignitary harm.

135. SMH and CVS Health acted with deliberate indifference to Plaintiff's federally protected rights by knowingly relying on unsupported psychiatric labeling, disregarding available contrary information, and proceeding with custodial escalation despite the obvious risk of unlawful deprivation of Plaintiff's rights under the ADA and Section 504.

136. SMH's and CVS Health's discrimination was intentional and undertaken with deliberate indifference to Plaintiff's federally protected rights, entitling Plaintiff to compensatory damages under Title II of the ADA and Section

504 of the Rehabilitation Act as permitted by law.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants subject to the Americans with Disabilities Act and Section 504 of the Rehabilitation Act against Defendants SMH and CVS Health, and award:

(a) compensatory damages in an amount to be determined at trial, to the extent permitted under Title II of the ADA and Section 504 of the Rehabilitation Act;

(b) declaratory relief;

(c) injunctive relief as appropriate to prevent future discrimination;

(d) costs and attorneys' fees pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a; and

(e) such other and further relief as the Court deems just and proper.

## COUNT IV - FRAUD / FRAUDULENT MISREPRESENTATION AND FRAUDULENT RECORDKEEPING
(Against Defendants CVS Health Corporation, CaroMont Health, Jacqueline Folks, M.D., Judy Vu Spica, R.Ph., Lehem Besera, N.P., and Vera Rivera, N.P.)

This claim arises from the intentional and reckless fabrication, adoption, and transmission of materially false factual representations concerning Plaintiff's mental condition by Folks, Spica, Besera, and Rivera. These Defendants recorded, repeated, and disseminated unsupported psychiatric characterizations as established fact in order to trigger and justify custodial escalation.

Specifically, Folks maintained an unsupported diagnosis of Major Depression in

36

Plaintiff's medical record; Spica falsely reported that Plaintiff described herself as "manic-depressive" and in psychiatric crisis; Besera entered and transmitted diagnostic characterizations including Major Depression and Suicidal Ideation without factual findings establishing statutory criteria; and Rivera authored an electronic record entry describing a law-enforcement interaction that had not occurred. These representations were presented as verified fact and were intended to induce reliance by law enforcement and hospital personnel exercising custodial authority.

This claim is based on intentional misrepresentation, fabrication of factual information, and fraudulent recordkeeping. It does not arise from medical diagnosis, treatment decisions, or professional medical judgment.

137. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

138. Folks, Besera, and Rivera entered or transmitted psychiatric diagnostic information that was materially false and presented as established fact without contemporaneous verification or documented findings.

139. Specifically, Folks entered and maintained a diagnostic code for Major Depression without conducting or documenting any psychiatric evaluation establishing diagnostic criteria for that condition. Folks was not present and did not interact with Plaintiff on April 27, 2024, and the diagnostic code

remained in Plaintiff's electronic medical record as a preexisting entry created and maintained by Folks. No examination findings or clinical assessment supported the coding, and the diagnosis was never discussed with Plaintiff. Nevertheless, the code remained active and was later transmitted and relied upon by downstream providers and custodial decision-makers as established fact in liberty-affecting decisions.

140. In connection with the escalation of Plaintiff's medication-access request, Spica falsely stated or conveyed that Plaintiff had identified herself as "manic-depressive" and was experiencing a psychiatric "crisis" due to lack of medication. Plaintiff made no such statements and did not express suicidal intent or psychiatric emergency. These representations were materially false, were not based on Plaintiff's words or observed behavior, and were made knowingly or with reckless disregard for their truth.

141. Spica initiated, and Besera adopted, the assertion that Plaintiff was experiencing a psychiatric crisis, presenting it as established fact without contemporaneous factual support and despite Plaintiff's express denials. That same crisis characterization was then repeated in communications and electronic record entries preceding custodial escalation.

142. The false psychiatric representations and fabricated record entries were material because they were foreseeable and intended to be relied upon by

third parties exercising custodial authority, including law enforcement and hospital personnel, and were relied upon as a substitute for contemporaneous factual evaluation and individualized assessment in decisions depriving Plaintiff of liberty and access to prescribed medication.

143. The fraudulent statements and record entries created and transmitted by Spica, Besera, and Rivera on April 27, 2024, immediately preceded Plaintiff's seizure and were communicated through CVS electronic medical record systems and direct reports to law enforcement. These representations were treated as accurate descriptions of Plaintiff's mental state and were relied upon in initiating and effectuating involuntary custody and denial of medication access.

144. The fraudulent misrepresentations described above consisted of psychiatric characterizations created, maintained, adopted, or transmitted by Defendants Folks, Spica, Besera, and Rivera. On or about April 27, 2024, those characterizations were communicated through CVS electronic medical record entries and direct communications to law enforcement officers and were presented as established fact despite the absence of contemporaneous factual findings supporting suicidal ideation, psychiatric crisis, or statutory criteria for involuntary detention.

145. The false psychiatric representations were made orally and through electronic medical record entries during the escalation of Plaintiff's medication-access request, including communications from Besera to law enforcement, and were transmitted and relied upon in real time by responding officers and hospital personnel to justify custodial seizure and continued confinement.

146. Spica and Besera made false representations to law enforcement officers for the purpose of prompting custodial intervention, knowing the officers would document those statements and rely upon them in taking Plaintiff into custody. Those documented statements were transmitted to SMH emergency personnel and relied upon in continuing Plaintiff's detention and restricting her access to prescribed medication.

147. Plaintiff was a foreseeable and intended victim of the fraud committed by Folks, Spica, Besera, and Rivera because their false psychiatric representations were designed to trigger custodial escalation and involuntary detention, and they knew the natural and probable consequence of those misrepresentations would be Plaintiff's seizure, confinement, and deprivation of medication.

148. The false representations made and transmitted by Folks, Spica, Besera, and Rivera were relied upon by law enforcement and hospital personnel in

40

decisions affecting Plaintiff's liberty and medication access, and Plaintiff suffered concrete injury as a direct result, including loss of liberty, denial of prescribed medication, acute withdrawal, permanent neurological injury, and emotional distress.

149. As reflected in **Exhibit B**, pages 3 and 5, Besera entered diagnostic characterizations including Major Depression and Suicidal Ideation and recorded observations inconsistent with Plaintiff's actual words and conduct. Plaintiff denied suicidal ideation and expressed no intent, plan, or means of harm. The entry documented no facts establishing imminent risk or statutory criteria yet those characterizations were transmitted as established fact in circumstances foreseeably resulting in custodial seizure.

150. At 1:25 p.m., Rivera authored an electronic record entry attributing psychiatric symptoms to Plaintiff and documenting a confrontational law-enforcement interaction involving behavioral escalation and police intervention. At that time, Plaintiff was physically present at a different CVS location that was closing for lunch, and no law-enforcement officers had arrived or interacted with Plaintiff. Rivera had no contact with Plaintiff and conducted no examination, assessment, or factual inquiry before creating the entry. Body-worn camera footage from the subsequent law enforcement encounter reflects no resistance, agitation, or escalation consistent with the

interaction described in Rivera's entry. The entry nevertheless placed unsupported psychiatric and custodial representations into CVS's electronic medical record system without personal knowledge, verification, or contemporaneous factual basis.

151. Folks maintained psychiatric diagnostic codes in Plaintiff's medical record without documented contemporaneous factual support and under circumstances where such entries would foreseeably be accessed and relied upon by downstream providers and custodial decision-makers in liberty-affecting determinations.

152. Defendants CVS Health and CaroMont Health maintained electronic record systems that permitted the creation, maintenance, and transmission of unsupported psychiatric characterizations, which were accessed and relied upon by downstream providers and law enforcement in liberty-affecting decisions. These systems allowed such entries to be treated as verified fact without contemporaneous factual verification or supervisory review.

153. Defendants' electronic record systems lacked safeguards requiring personnel to distinguish between verified contemporaneous factual findings and inherited or unsupported chart characterizations before transmitting psychiatric representations to law enforcement or other custodial decision-makers.

154. Folks, Spica, Besera, and Rivera entered and transmitted false psychiatric information knowingly or with reckless disregard for its truth and without verifying its factual basis before presenting it as authoritative fact in circumstances foreseeably affecting Plaintiff's liberty. Such conduct was willful and undertaken in conscious disregard of the substantial likelihood that custodial seizure and continued confinement would result, including involuntary transport and continued detention under the Baker Act.

155. Defendants knew or should have known that transmitting unsupported psychiatric characterizations in custodial escalation contexts created a foreseeable risk of unlawful confinement, denial of medication access, acute withdrawal, and neurological injury.

156. The false psychiatric representations made by Folks, Spica, Besera, and Rivera were intended to induce reliance by third parties exercising custodial or law-enforcement authority, including hospital personnel and law enforcement officers, as a substitute for contemporaneous factual evaluation or individualized assessment.

157. Law enforcement officers and hospital personnel relied on Defendants' psychiatric representations in seizing Plaintiff, escalating her into involuntary custody, denying her access to prescribed medication, and continuing her confinement in the absence of independently documented

statutory criteria.

158. Police body-worn camera footage reflects that officers relied upon information provided "according to the nurse," including assertions that Plaintiff was depressed and exhibiting "incoherence and irrationality," and did not articulate independent contemporaneous observations establishing statutory dangerousness prior to initiating custody.

159. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff suffered loss of liberty, denial of prescribed medication, acute withdrawal, continuing neurological injury, emotional distress, reputational injury, economic loss, and other consequential damages.

160. Folks, Spica, Besera, and Rivera made false statements concerning material facts; knew the statements were false or acted with reckless disregard for their truth at the time they were made; intended that law enforcement officers and hospital personnel rely upon those statements in liberty-affecting decisions; such reliance reasonably occurred; and Plaintiff suffered damages as a direct and proximate result. Their fraudulent conduct was intentional and willful, undertaken with conscious indifference to Plaintiff's liberty and safety, supporting compensatory and punitive damages under Florida law.

63. Plaintiff objected and demanded the return of her phone. Instead, Besera continued relaying psychiatric information over speakerphone despite Plaintiff's clear statement that the information was inaccurate.

64. Besera stated to Sarasota Police that Plaintiff told her she was both suicidal and homicidal. Plaintiff made no such statement. The assertion was conveyed to law enforcement as a basis for involuntary detention.

65. Defendant Besera did not execute a Baker Act certificate and did not conduct a qualifying mental-health examination before communicating assertions of suicidality or homicidality to law enforcement. The responding officers placed Plaintiff in involuntary custody in reliance on those representations and without independent clinical findings establishing statutory criteria.

66. Prior to placing Plaintiff into custody, one responding law-enforcement officer stated to his partner, in substance, "All this hearsay…," reflecting expressed doubt about the information being relayed as the basis for detention.

## LAW ENFORCEMENT SEIZURE AND HOSPITAL DETENTION

67. Plaintiff was seized and transported for involuntary examination under Florida's Baker Act based on psychiatric crisis representations transmitted by Defendants Spica and Besera, despite the absence of documented facts

15

162. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

163. At all relevant times, Defendants owed Plaintiff a duty to exercise reasonable care in supervising personnel, verifying information before custodial escalation, maintaining accurate records, communicating with law enforcement, and facilitating medication access during custodial restraint affecting Plaintiff's liberty.

164. These duties arise from general negligence principles governing administrative, supervisory, and custodial conduct and exist independently of any professional medical standard of care. The claims concern the transmission and operational use of unsupported factual characterizations in liberty-affecting decisions, not the provision of medical care.

165. Defendants breached their duties of reasonable care by engaging in conduct including, but not limited to:

(a) maintaining and transmitting unsupported psychiatric characterizations without factual verification safeguards;

(b) communicating psychiatric labels to law enforcement without verifying their factual basis, including communications by Spica and Besera;

(c) failing to train and supervise personnel regarding the statutory limits governing custodial escalation;

(d) escalating a routine medication-access issue without confirming objective factual support for custodial escalation;

46

(e) failing to correct known errors after notice;

(f) failing to facilitate short-term continuity of prescribed medication during custodial restraint affecting Plaintiff's liberty despite possessing authority to do so;

(g) failing to consider readily available non-custodial alternatives;

(h) permitting unsupported psychiatric characterizations to be treated as verified fact in custodial escalation without adequate supervisory safeguards; and

(i) approving custodial escalation, including approval by Defendants Taylor and Calvo, despite the absence of contemporaneous statutory criteria or documented factual support.

166. Defendants further failed to implement safeguards requiring personnel to distinguish between verified contemporaneous factual findings and inherited chart characterizations before communicating assertions to law enforcement or invoking custodial escalation affecting Plaintiff's liberty.

167. Defendants knew or should have known that the foregoing acts and omissions created a foreseeable risk of unlawful confinement, denial of medication access, acute withdrawal, and neurological injury, particularly where Defendants controlled both Plaintiff's access to medication and the information transmitted to decision-makers responsible for custodial intervention.

168. Defendants' breaches of duty were the direct and proximate cause of Plaintiff's injuries, including loss of liberty, physical injury, neurological

harm, emotional distress, medical expenses, and other consequential damages, all of which were reasonably foreseeable consequences of negligent escalation, negligent supervision, and negligent retention.

169. At all relevant times, Defendants maintained and utilized electronic record systems containing psychiatric characterizations concerning Plaintiff, with knowledge that such entries would foreseeably affect liberty-affecting decisions and Plaintiff's access to medication and had the ability to implement safeguards to prevent reliance on unsupported or unverified information but failed to do so.

170. Taylor and Calvo possessed authority to approve or halt custodial escalation and affirmatively approved escalation despite the absence of contemporaneous statutory criteria or documented factual support, thereby directly participating in and authorizing the liberty-affecting restraint.

171. Defendants negligently retained personnel who engaged in improper escalation and false record-based communications despite notice of misconduct and the resulting risk of unlawful custodial restraint. By failing to remove, retrain, or restrict such personnel, Defendants allowed the same administrative failures to continue, which was a substantial factor in causing Plaintiff's injuries.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants CVS Health Corporation, CaroMont Health, Sarasota Memorial Hospital, Aldo Calvo, D.O., and Danielle Taylor, Pharm.D., and award:

(a) compensatory damages in an amount to be determined at trial;

(b) costs of suit and applicable pre- and post-judgment interest; and

(c) such other and further relief as the Court deems just and proper.

## COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against Defendants Sarasota Memorial Hospital, CVS Health Corporation, Judy Vu Spica, R.PH, Lehem Besera, N.P., and Vera Rivera, N.P.)

This claim arises from Defendants' intentional and reckless misuse of custodial authority through unsupported psychiatric characterizations to subject Plaintiff to false labeling, involuntary confinement, denial of prescribed medication, and coercive threats of continued detention in the absence of lawful justification.

172.  Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

173.  SMH and its participating employees and agents engaged in intentional or reckless conduct that was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized community, including conduct undertaken while Plaintiff was physically confined, isolated, and dependent upon those Defendants for medication, release, and personal safety.

49

174. The following Defendants' conduct included, but was not limited to:

(a) Besera publicly relayed false psychiatric information to law enforcement in Plaintiff's presence before her family;

(b) Spica, Besera, and Rivera treated Plaintiff as psychiatrically unstable despite the absence of contemporaneous factual support and documented findings negating statutory criteria;

(c) Spica and Besera subjected Plaintiff to involuntary custodial control based on false or unsupported psychiatric characterizations;

(d) SMH and its participating employees and agents denied Plaintiff access to her longstanding, lawfully prescribed medication despite knowledge of the risks of abrupt discontinuation;

(e) SMH and its participating employees and agents coerced Plaintiff to ingest unrelated psychotropic medication while Plaintiff was confined and under total custodial control;

(f) SMH and its participating employees and agents disregarded Plaintiff's escalating physical distress, visible neurological symptoms, fear, and repeated pleas for assistance while maintaining exclusive custodial control over her liberty and access to medication;

(g) SMH personnel approved or permitted custodial escalation and threats of continued confinement after documented findings negated qualifying criteria.

175. SMH, CVS Health, Spica, Besera, and Rivera knew, or acted in reckless disregard of the high probability, that misuse of custodial authority under these circumstances would cause severe emotional distress, humiliation, fear, and psychological trauma, particularly where Plaintiff was confined, isolated, and unable to obtain medical care independently, and where those Defendants were aware of Plaintiff's repeated requests for prescribed

50

medication and of documented findings negating statutory criteria for continued confinement.

176. SMH, CVS Health, Spica, Besera, and Rivera acted with intent to cause severe emotional distress or with reckless disregard of the high probability that such distress would result.

177. SMH and its participating employees and agents maintained and enforced custodial control despite documented findings negating statutory criteria and despite Plaintiff's express denials, thereby prolonging confinement in the absence of lawful basis.

178. As a direct and proximate result of SMH's, CVS Health's, Spica's, Besera's, and Rivera's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including terror, humiliation, anxiety, loss of dignity, and psychological injury.

179. Plaintiff's emotional distress was severe and enduring and was accompanied by objectively verifiable physical symptoms during confinement, including acute withdrawal, syncope, tremors, and neurological injury arising from the abrupt interruption of prescribed medication.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants SMH, CVS Health, Spica, Besera, Rivera and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

## COUNT VII - DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
(42 U.S.C. §§12102, 12182)
(Regarded-As Disability - Public Accommodation)
(Against Defendants CVS Health Corporation)

This claim arises from Defendant CVS Health's discrimination against Plaintiff on the basis of a perceived mental impairment in the operation of a place of public accommodation, including disparate treatment and denial of equal access to routine pharmacy services.

180. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

181. Defendant CVS Health owns, operates, leases, or controls places of public accommodation within the meaning of 42 U.S.C.§12181(7), including retail pharmacy locations open to the public.

182. Plaintiff was not experiencing manic depression, bipolar disorder, or any comparable psychiatric condition at the time of the events alleged herein and did not report, describe, or exhibit symptoms consistent with such a condition.

183. During the interaction at issue, Plaintiff sought routine pharmacy assistance and did not express suicidal ideation or qualifying statutory criteria for involuntary detention.

184. As previously alleged, CVS Health, acting through its pharmacist Spica, characterized Plaintiff as "manic depressive" and "in crisis," although Plaintiff was experiencing medication withdrawal and requesting assistance, not expressing suicidal ideation or psychiatric emergency.

185. CVS Health, acting through Spica, thereafter treated Plaintiff as though she were experiencing a psychiatric crisis and escalated the encounter to custodial and law enforcement involvement rather than providing routine pharmacy assistance available to similarly situated customers.

186. By characterizing Plaintiff as "manic depressive" and "in crisis," Defendant regarded Plaintiff as having a mental impairment within the meaning of 42 U.S.C. § 12102.

187. By reason of that perceived mental impairment, Defendant subjected Plaintiff to differential treatment, including escalation beyond routine pharmacy procedures and involvement of custodial authorities that would not have occurred absent the perceived impairment.

188. Similarly situated pharmacy customers seeking prescription clarification, refill assistance, or payment resolution are not subjected to psychiatric

characterization or custodial escalation in the absence of perceived mental impairment.

189. By treating Plaintiff differently on the basis of actual or perceived mental impairment, Defendant denied Plaintiff the full and equal enjoyment of the goods and services of a place of public accommodation in violation of 42 U.S.C. §12182(a).

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant CVS Health Corporation and award:

(a) declaratory relief that Defendant's conduct violated the Americans with Disabilities Act, 42 U.S.C.§§12102 and 12182;

(b) injunctive relief prohibiting discriminatory treatment based on actual or perceived mental impairment;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

**COUNT VIII - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
(Against Defendants CVS Health Corporation, Sarasota Memorial Hospital, CaroMont Health, and Participating Individuals Defendants)

This claim arises from Defendants' negligent custodial escalation and denial of prescribed medication, which foreseeably caused Plaintiff severe emotional distress accompanied by contemporaneous physical injury and objectively verifiable symptoms during confinement.

190. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

191. At all relevant times, Defendants owed Plaintiff a duty to exercise reasonable care in operational custodial and administrative functions, including accurate communication of information to law enforcement and reasonable control of medication access while Plaintiff was confined and unable to obtain medication independently.

192. Defendants breached their duties of care by negligently engaging in conduct including, but not limited to:

(a) Besera publicly communicated unsupported psychiatric information to law enforcement in Plaintiff's presence and within earshot of Plaintiff's family and other individuals present;

(b) Spica and Besera communicated unsupported psychiatric characterizations to law enforcement in circumstances foreseeably resulting in custodial seizure;

(c) SMH and its participating employees and agents failed to facilitate access to Plaintiff's prescribed medication while exercising exclusive custodial control over her ability to obtain it;

(e) SMH personnel subjected Plaintiff to threats of continued confinement unrelated to any legitimate emergency purpose;

(f) SMH and its participating employees and agents disregarded Plaintiff's visible distress, fear, and pleas for assistance while maintaining exclusive control over her liberty and medical access.

193. Each corporate Defendant is liable for the negligent acts and omissions of its employees and agents acting within the course and scope of their roles during the custodial escalation and confinement events alleged herein.

55

194. As a direct and proximate result of Defendants' negligence, Plaintiff suffered severe emotional distress, including terror, humiliation, anxiety, and loss of dignity, accompanied by physical injury occurring during custodial confinement.

195. Plaintiff's emotional distress was accompanied by objectively verifiable physical manifestations, including tremors, syncope, palpitations, neurological injury, and visible bruising sustained during confinement. These physical injuries and observable manifestations occurred contemporaneously with Defendants' custodial conduct and during the abrupt interruption of Plaintiff's prescribed medication.

196. Defendants' negligent acts and omissions were a substantial contributing and proximate cause of Plaintiff's emotional and physical injuries and resulting damages.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants liable for negligent infliction of emotional distress, and award:

    (a) compensatory damages in an amount to be determined at trial;

    (b) costs of suit and applicable pre- and post-judgment interest; and

    (c) such other and further relief as the Court deems just and proper.

## COUNT IX - FALSE IMPRISONMENT
(Against Defendants CVS Health Corporation, Sarasota Memorial Hospital, and Participating Individual Defendants)

This claim arises from Defendants' unlawful restraint and confinement of Plaintiff against her will through custodial escalation and reliance on unsupported psychiatric information, without statutory authority or lawful justification, and through the knowing initiation and procurement of law-enforcement seizure based on materially false or unverified information that Defendants intended and understood would be acted upon by responding officers as authoritative clinical fact and as a sufficient basis to trigger involuntary custody.

197. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

198. Under Florida law, false imprisonment is the unlawful restraint of a person against her will and without legal authority, including detention procured through materially false representations supplied to law enforcement that serve as the operative cause of restraint.

199. The psychiatric crisis representations originated with Spica, and were transmitted among CVS personnel during the escalation process, including to Besera, and Rivera. Those representations were adopted, repeated, or documented by CVS personnel and presented to law enforcement as established factual information with the understanding that responding

57

officers would rely upon them as a basis to invoke custodial authority under the Baker Act.

200. Plaintiff's seizure was procured through psychiatric characterizations transmitted by Spica and Besera rather than independently documented statutory findings. Body-worn camera footage and custodial records reflect reliance on information supplied by Spica and Besera in initiating custody.

201. No responding officer documented independently observed facts establishing imminent dangerousness, incapacity, or other qualifying statutory criteria prior to seizure or transport. Custodial and transport records reflect reliance on transmitted psychiatric representations rather than independently articulated findings satisfying Baker Act standards.

202. Body-worn camera footage reflects that an officer asked Plaintiff whether she had thoughts of harming herself. Plaintiff acknowledged distress during medication withdrawal but did not express intent, plan, imminence, or means to harm herself or others. Plaintiff remained calm and coherent and explained that she was seeking a refill of her prescribed medication. Officers proceeded with custody without articulating independently observed facts establishing imminent dangerousness.

203. Body-worn camera footage reflects that, prior to approaching Plaintiff, a responding officer stated, "All this third party hearsay," referring to the

58

report initiated by Spica. After receiving psychiatric representations transmitted by Besera, the arresting officer questioned whether the situation was legitimate. Custody nevertheless proceeded without independently documented findings of imminent dangerousness.

204. One who instigates or procures an unlawful detention is liable for false imprisonment even where physical restraint is carried out by law enforcement. Because Spica and Besera supplied materially false or recklessly unsupported psychiatric representations that operated as the operative cause of custody, any asserted statutory authority was vitiated by the absence of qualifying statutory criteria.

205. Plaintiff did not exhibit qualifying statutory criteria for involuntary examination at the time of seizure or during continued confinement, and no independently observed facts were recorded that would have justified custody absent the psychiatric representations transmitted by Spica and Besera.

206. Because the detention was procured through materially false or recklessly unsupported representations and in the absence of qualifying statutory criteria, Defendants lacked lawful authority to restrain Plaintiff.

207. Spica and Besera invoked and enforced custodial escalation in the absence of a lawful statutory predicate or emergency necessity, using unsupported

psychiatric characterizations as a substitute for independently observed qualifying criteria.

208. Defendants knowingly and substantially participated in procuring Plaintiff's confinement by transmitting, documenting, adopting, and repeating unsupported psychiatric characterizations as established fact, and by continuing to rely upon those characterizations after documented in-person findings and Plaintiff's express denials demonstrated that statutory criteria were not satisfied.

209. Plaintiff did not consent to her confinement, was aware of and harmed by the restraint imposed upon her liberty, and did not engage in conduct that would have independently justified involuntary detention under applicable statutory standards.

210. Defendants acted intentionally or with reckless disregard for Plaintiff's right to freedom of movement and for the statutory limitations governing involuntary detention.

211. As a direct and proximate result of Defendants' false imprisonment, Plaintiff suffered loss of liberty, humiliation, emotional distress, denial of prescribed medication, physical injury, and continuing neurological injury during and following her confinement.

212. Corporate Defendants are liable because supervisory personnel with authority to halt or correct custodial escalation knew or should have known that statutory criteria were not satisfied and failed to retract or correct unsupported crisis representations after exculpatory findings were documented, thereby causing and ratifying the continued unlawful restraint.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants liable for false imprisonment, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law including against corporate Defendants based upon intentional misconduct, ratification, authorization, or grossly negligent supervision by managing agents or persons with policy-making authority who knew or should have known of the unlawful escalation and failed to prevent it.

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

**COUNT X - RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY**
(Against Defendants CVS Health Corporation, CaroMont Health, and Sarasota Memorial Hospital)

This claim arises from tortious and unlawful acts committed by Defendants' employees and agents within the course and scope of their employment, for which the corporate and institutional Defendants are vicariously liable under principles of agency, apparent authority, and respondeat superior.

61

213. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

214. At all relevant times, the individual Defendants, including but not limited to pharmacists, nurse practitioners, physicians, supervisors, and administrative personnel, were employees, agents, or apparent agents of Defendants CVS Health, CaroMont Health, and SMH and acted with actual or apparent authority granted by those entities.

215. At all relevant times, the individual Defendants acted within the course and scope of their employment while performing assigned duties, including escalation, custody coordination, telehealth, pharmacy operations, and record-handling functions.

216. The acts and omissions alleged in the foregoing Counts were committed by individual Defendants while performing assigned duties, exercising delegated authority, or carrying out institutional protocols, using Defendants' systems, credentials, and escalation pathways.

217. Defendants exercised supervisory authority over their employees and retained the ability to approve, halt, or correct the conduct at issue.

218. As a direct and proximate result of the acts and omissions of their employees and agents, Defendants CVS Health, CaroMont Health, and SMH are vicariously liable for all damages caused to Plaintiff under the doctrine of

respondeat superior because the wrongful acts were undertaken within the course and scope of employment and were carried out through Defendants' institutional systems, protocols, and supervisory authority.

219. The harms suffered by Plaintiff were a foreseeable consequence of the institutional functions entrusted to Defendants' employees and arose directly from the execution of established systems and supervisory practices.

220. Defendants are vicariously liable for the intentional torts alleged herein because those torts were committed within the course and scope of employment and through the use of Defendants' institutional systems.

221. This Count seeks vicarious liability solely as to the state-law tort claims alleged herein and does not assert respondeat superior liability under 42 U.S.C. § 1983.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants CVS Health, CaroMont Health, and SMH on the basis of vicarious liability, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law, where applicable;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

## COUNT XI - RATIFICATION AND FAILURE TO INTERVENE
(Against Defendants CVS Health Corporation, CaroMont Health, Sarasota Memorial Hospital, Danielle Taylor, Pharm.D., and Aldo Calvo, D.O.)

This Count asserts institutional and supervisory liability based on Defendants' ratification of, and failure to intervene in, ongoing unlawful conduct after notice that no contemporaneous statutory predicate supported Plaintiff's continued custodial restraint.

222. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

223. At all relevant times, Defendants Danielle Taylor, Pharm.D., and Aldo Calvo, D.O., possessed supervisory authority to halt custodial escalation, retract unsupported psychiatric representations, and correct misinformation transmitted to law enforcement and hospital personnel.

224. Following the initiation of custody, documented in-person findings and available records reflected no suicidal ideation, no qualifying statutory criteria, and no independently observed facts establishing imminent dangerousness.

225. Despite such notice, Taylor and Calvo failed to intervene, halt continued custodial restraint, correct unsupported psychiatric characterizations, restore medication continuity, or retract crisis representations previously transmitted.

226. These practices were operationalized through Defendants' custodial escalation protocols and electronic record systems, which permitted unsupported psychiatric characterizations to be treated as verified predicates for involuntary detention without contemporaneous factual verification.

227. CVS Health and SMH had actual or constructive knowledge of the absence of contemporaneous statutory findings through supervisory review systems, escalation approval records, electronic medical records, and Plaintiff's direct objections. CaroMont Health maintained and transmitted electronic medical records containing unsupported psychiatric diagnostic entries that were accessed and relied upon in the custodial escalation described herein.

228. Despite that knowledge, Defendants permitted continued reliance on unsupported psychiatric characterizations and maintained custodial control without corrective action.

229. By failing to intervene after notice that statutory criteria were not satisfied and permitting continued confinement and denial of medication, CVS Health and SMH - through supervisory personnel including Taylor and Calvo - ratified the underlying unlawful conduct as institutional action.

230. This ratification was the moving force behind Plaintiff's continued deprivation of liberty, denial of medication, physical injury, neurological harm, emotional distress, and related damages.

231. Defendants' failure to intervene in an ongoing constitutional and tortious deprivation constitutes an independent basis for supervisory and institutional liability to the extent permitted under 42 U.S.C. § 1983 and applicable state law.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants CVS Health and SMH for ratification and failure to intervene, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

## COUNT XII - INSTITUTIONAL LIABILITY UNDER 42 U.S.C. § 1983
(Policy, Practice, or Custom – Monell)
(Against Defendants CVS Health Corporation and Sarasota Memorial Hospital)

This claim arises from institutional policies, practices, customs, and ratification that were the moving force behind the unconstitutional seizure, continued detention, and denial of medication inflicted upon Plaintiff.

232. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

233. CVS Health and SMH acted under color of state law by invoking and utilizing Florida's Baker Act to initiate involuntary custody in concert with

law enforcement. By participating directly in custodial escalation pursuant to state statutory authority and coordinating detention decisions with responding officers, CVS Health and SMH exercised power traditionally reserved to the State, rendering their conduct fairly attributable to the State for purposes of 42 U.S.C. § 1983.

234. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), an entity acting under color of state law is liable under 42 U.S.C. § 1983 when a constitutional deprivation is caused by its policies, practices, customs, decisions of final policymakers, or deliberate indifference in training or supervision that is the moving force behind the deprivation.

235. The constitutional violations alleged herein were caused by and resulted from CVS Health's and SMH's official policies, widespread practices, and customs, including:

(a) policies permitting the creation, maintenance, and transmission of unsupported psychiatric characterizations without contemporaneous factual verification;

(b) practices allowing inherited chart labels or administrative entries to be treated as authoritative factual representations in liberty-affecting decisions without independent verification;

(c) escalation protocols favoring custodial intervention over verification, de-escalation, or non-custodial alternatives;

(d) practices tolerating denial of prescribed medication during custodial restraint despite known withdrawal risks;

(e) failure to implement safeguards preventing reliance on unsupported psychiatric characterizations in liberty-affecting decisions;

(f) failure to train and supervise personnel regarding constitutional limits on involuntary detention and the requirement of individualized factual support before initiating or maintaining custodial restraint; and

(g) system design and record-handling practices permitting unsupported diagnostic entries—including entries reflecting Major Depression and Suicidal Ideation—to propagate across interoperable electronic platforms without verification safeguards, correction mechanisms, or audit-triggered review before downstream reliance in decisions affecting Plaintiff's liberty.

236. CVS Health's and SMH's final policymakers were deliberately indifferent to the substantial and obvious risk that permitting unsupported psychiatric characterizations to be entered, propagated, and transmitted through interoperable electronic systems without verification safeguards would result in unlawful seizure, continued detention, and denial of medication. The risk that unverified crisis representations would be relied upon in invoking involuntary custody under the Baker Act was foreseeable and inherent in CVS Health's and SMH's escalation design, yet CVS Health and SMH failed to implement corrective safeguards, audit mechanisms, or supervisory controls to prevent such misuse.

237. At all relevant times, Taylor and Calvo possessed final authority within their respective operational domains to approve, halt, or reverse custodial escalation decisions and to correct or retract unsupported psychiatric

characterizations entered into CVS Health's and/or SMH's electronic systems. Their approval and failure to intervene therefore constituted final policymaking decisions attributable to CVS Health and/or SMH, as applicable.

238.  CVS Health and SMH, through supervisory personnel including Taylor and Calvo, who possessed authority to approve or halt escalation and to correct or retract unsupported psychiatric representations, ratified the unconstitutional conduct by permitting custodial escalation to proceed and by failing to correct false electronic entries after notice of the absence of statutory criteria, thereby adopting the conduct as institutional policy.

239.  At all relevant times, Taylor and Calvo possessed authority within their respective operational roles at CVS Health to approve or halt custodial escalation and to require verification of psychiatric representations before such escalation proceeded. They approved escalation without independent verification or corrective action, and that approval foreseeably contributed to the deprivation of Plaintiff's liberty.

240.  CVS Health's and SMH's policies, practices, customs, and ratification were the moving force behind Plaintiff's deprivation of liberty without due process and resulting physical, neurological, and emotional injuries.

241. As a result of CVS Health's and SMH's Monell violations, Plaintiff suffered damages including loss of liberty, denial of prescribed medication, continuing neurological injury, emotional distress, and economic loss.

242. The constitutional violations described herein were not isolated acts of a single employee but resulted from CVS Health's and SMH's escalation pathways, electronic record practices, supervisory approval structures, and custodial coordination with law enforcement that predictably produced the deprivation of Plaintiff's liberty.

243. CVS Health's and SMH's failure to implement verification safeguards and training protocols regarding reliance on psychiatric characterizations in liberty-affecting decisions constituted deliberate indifference to an obvious risk of unlawful seizure and continued confinement.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants CVS Health and SMH under 42 U.S.C. § 1983, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) declaratory relief;

(c) costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(d) such other and further relief as the Court deems just and proper.

**COUNT XIII - DECLARATORY AND INJUNCTIVE RELIEF**
(Against All Defendants)

This claim arises from the ongoing maintenance and potential future reliance upon unsupported psychiatric characterizations and related practices that pose a real and immediate risk of continuing injury absent declaratory and injunctive relief.

244. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

245. An actual and continuing case or controversy exists concerning the ongoing maintenance and accessibility of unsupported psychiatric characterizations within Defendants' interoperable electronic systems, which remain active and retrievable and are capable of being relied upon in the future in liberty-affecting or medication-access decisions.

246. The unsupported psychiatric characterizations remain active within interoperable electronic systems and are retrievable by downstream providers and institutional actors. Because these entries remain uncorrected, they may be accessed or relied upon in future healthcare or custodial interactions. Plaintiff lacks the ability to independently correct or remove these entries absent judicial intervention. These entries remain capable of being accessed and relied upon by healthcare providers, pharmacies, hospitals, and law-enforcement personnel in future encounters involving Plaintiff, creating a continuing risk of renewed reliance on unsupported

psychiatric characterizations.

247. Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57 that the maintenance and future reliance upon materially false psychiatric characterizations violate her rights under the United States Constitution, the Americans with Disabilities Act, and applicable state law.

248. Absent injunctive relief, Plaintiff faces a real and immediate risk that unsupported psychiatric characterizations will be accessed or relied upon in future healthcare or custodial contexts, resulting in discriminatory treatment, denial of services, or renewed liberty-affecting consequences beyond Plaintiff's control.

249. Plaintiff seeks narrowly tailored injunctive relief requiring Defendants to:

(a) correct, remove, or clearly annotate unsupported psychiatric characterizations within records maintained or controlled by Defendants so that any future user of the record is alerted that the entries are unsupported, disputed, and may not be relied upon as verified clinical findings;

(b) cease treating inherited or unverified psychiatric labels as authoritative factual representations in liberty-affecting decisions unless supported by contemporaneous clinical findings documented by the evaluating provider;

(c) implement verification safeguards requiring personnel to confirm and document contemporaneous factual support before transmitting psychiatric crisis representations to law enforcement for purposes of custodial intervention;

72

(d) adopt and enforce written policies requiring contemporaneous factual support to be documented before escalation based on psychiatric characterizations or transmission of psychiatric crisis representations to law enforcement.

250. Plaintiff further seeks injunctive relief necessary to ensure transparency, auditability, and traceability of electronic record entries relating to the unsupported psychiatric characterizations at issue.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter declaratory and injunctive relief as set forth above, together with costs of suit, attorneys' fees where authorized by statute, and such other and further relief as the Court deems just and proper.

## COUNT XIV – ASSAULT
(Against Defendants Sarasota Memorial Hospital and its Participating Employees and Agents)

This claim arises from Defendants' conduct placing Plaintiff in reasonable apprehension of imminent harmful or offensive bodily contact through coercive custodial pressure and while Plaintiff was involuntarily confined.

251. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

252. Under Florida law, assault occurs when a defendant intentionally places another person in reasonable fear or apprehension of an imminent harmful or offensive contact.

253. While Plaintiff was involuntarily confined at SMH under custodial authority, Defendants, including Dr. Patel and participating hospital staff, exercised control over Plaintiff's ability to obtain medication, access assistance, or leave the facility.

254. During this period of confinement, Defendants presented psychotropic medication to Plaintiff despite the fact that it was not part of her longstanding prescribed medication regimen and was unrelated to the medication-withdrawal condition she was experiencing.

255. Plaintiff initially objected to taking the medication.

256. At the time the medication was presented, Plaintiff remained involuntarily confined and dependent upon hospital personnel for medical care, medication access, and release from the facility. Plaintiff understood that she could not obtain treatment, leave the facility, or secure access to her prescribed medication without Defendants' cooperation.

257. Under these circumstances, Defendants' conduct placed Plaintiff in reasonable apprehension of imminent harmful or offensive bodily contact while she remained under custodial restraint, causing Plaintiff fear, humiliation, emotional distress, and loss of personal security.

258. Plaintiff further believed that refusal of the medication could affect her continued confinement or access to care while she remained under Defendants

74

custodial authority.

259. Defendants' conduct therefore intentionally placed Plaintiff in reasonable apprehension of imminent harmful or offensive bodily contact.

260. As a direct and proximate result of Defendants' assault, Plaintiff suffered fear, humiliation, emotional distress, and loss of personal security while under involuntary custodial restraint.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants liable for assault, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

## COUNT XV - BATTERY
(Against Defendants Sarasota Memorial Hospital and its Participating Employees and Agents)

This claim arises from the coerced, nonconsensual administration of psychotropic medication to Plaintiff while she was under custodial control.

261. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

262. Under Florida law, battery is the intentional and unauthorized touching of another person without consent, including the nonconsensual administration of medication.

263. While Plaintiff was under custodial control at SMH, Defendants, including Dr. Patel and participating SMH staff, intentionally caused Plaintiff to ingest psychotropic medication that was not part of her prescribed regimen and was unrelated to the acute withdrawal condition for which she sought assistance.

264. Plaintiff expressly refused the psychotropic medication. While maintaining custodial control over her confinement and ability to obtain release, Defendants presented the medication as the only available option while she remained restrained. Plaintiff ingested the medication under custodial pressure and fear of untreated withdrawal complications. Compliance under custodial restraint and threat of continued confinement does not constitute voluntary consent under Florida law.

265. Defendants knew that Plaintiff did not voluntarily consent and that her compliance resulted from custodial pressure and duress rather than free and informed choice.

266. The administration of psychotropic medication constituted an intentional physical invasion of Plaintiff's body without lawful justification, exigent medical necessity, or valid consent.

267. The administration of psychotropic medication was not supported by documented exigent medical necessity and was presented while Plaintiff remained involuntarily confined.

268. As a direct and proximate result of Defendants' battery, Plaintiff suffered physical injury, neurological harm, emotional distress, loss of bodily autonomy, and other damages.

269. Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's right to bodily integrity.

270. The battery occurred while Plaintiff was confined and deprived of meaningful ability to refuse, leave, or seek alternative care, thereby aggravating the invasion of bodily integrity.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants liable for battery, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

## COUNT XVI - DEFAMATION (DEFAMATION PER SE)
(Against Defendants CVS Health Corporation, Sarasota Memorial Hospital, and Participating Individual Defendants)

This claim arises from Defendants' publication of false psychiatric statements concerning Plaintiff to third parties, resulting in reputational harm and deprivation of Plaintiff's liberty.

77

271. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

272. Under Florida law, defamation consists of a false statement of fact published to a third party, concerning the plaintiff, that tends to harm the plaintiff's reputation and exposes the plaintiff to hatred, ridicule, contempt, or distrust.

273. Defendants made and published false statements of fact concerning Plaintiff, including falsely representing to law enforcement that Plaintiff was suicidal, manic, psychiatrically unstable, or a danger to herself or others, and presenting those assertions as confirmed factual conditions rather than as unverified concerns or preliminary clinical impressions.

274. These statements were communicated to law enforcement officers in a custodial context, both in Plaintiff's presence and outside her presence, and were understood and treated as authoritative factual representations. Defendants did not qualify the statements as unverified concern or disclose the absence of contemporaneous factual support and made the statements with knowledge of their falsity or with reckless disregard for the truth.

275. The statements were false. Plaintiff was experiencing acute neurological withdrawal symptoms and was seeking assistance in obtaining prescribed medication. Plaintiff did not express suicidal intent or plan, and Defendants' characterization of her as suicidal and in psychiatric crisis materially

misrepresented her condition.

276. Defendants knew the statements were false or acted with reckless disregard for their truth and presented them as authoritative fact without reasonable verification, knowing that third parties would rely upon them in liberty-affecting decisions.

277. Among the false statements published by Spica stated or conveyed to CVS personnel, Virtual Care clinicians, and third parties that Plaintiff had identified herself as "manic-depressive" and was experiencing a psychiatric "crisis" due to lack of medication. Plaintiff made no such statements.

278. These statements were not based on Plaintiff's words, observed conduct, or documented factual support and were presented as factual psychiatric assertions in a professional and custodial setting where recipients reasonably understood them as statements of fact.

279. Defendants acted negligently, recklessly, and/or with actual malice in publishing the statements, without reasonable investigation or factual basis.

280. To the extent any communication is subject to a qualified privilege, Defendants abused that privilege by publishing unsupported psychiatric accusations as statements of fact and by failing to verify the truth of those assertions before transmitting them to law enforcement.

79

281. Defendants acted with knowledge of falsity or with reckless disregard for the truth.

282. As a direct and proximate result of Defendants' defamatory statements, Plaintiff suffered reputational injury, humiliation, and emotional distress.

283. The statements were defamatory per se because they falsely imputed to Plaintiff serious mental illness, dangerousness, and incapacity—conditions that naturally tend to harm reputation without the need for proof of special damages.

284. Defendants published the defamatory statements to law enforcement officers with the intent and reasonable expectation that they would be relied upon as authoritative fact in liberty-affecting decisions, and such reliance occurred.

285. The diagnostic entries reflected in **Exhibit B**, pages 1 and 3, including Major Depression and Suicidal Ideation, remained active in Plaintiff's electronic medical record and were subsequently accessed by at least two additional healthcare providers, resulting in continued publication of defamatory statements and ongoing reputational harm.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants liable for defamation, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

## COUNT XVII - ABUSE OF PROCESS
(Against Defendant Sarasota Memorial Hospital, and Participating Hospital Defendants)

This claim arises from Defendants' willful misuse of custodial authority under Florida's Baker Act after the process was initiated, for purposes unrelated to the statute's limited emergency objectives.

286.    Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

287.    Under Florida law, abuse of process consists of the use of legal process against another primarily to accomplish a purpose for which the process was not designed.

288.    After Plaintiff was transported to and received at SMH pursuant to the Baker Act, Defendants possessed custodial authority solely for the limited statutory purpose of emergency examination consistent with defined statutory criteria.

289.    After completion of an in-person examination documenting no suicidal ideation and no qualifying basis for continued detention, Defendants nevertheless continued to exercise custodial authority.

290.    Rather than limiting use of the process to its statutory purpose, Defendants used custodial authority to:

(a) suppress Plaintiff's objections and complaints;

(b) compel compliance through continued restraint; and

(c) justify the denial of prescribed medication and the imposition of control for purposes unrelated to any lawful emergency objective.

291.  Defendants continued exercising custodial authority after the statutory purpose of emergency evaluation had been satisfied and no qualifying criteria were found. Defendants then used the custodial process as leverage to control Plaintiff's conduct, suppress objection, and deny medication for purposes unrelated to any lawful emergency objective.

292.  Despite the absence of documented statutory criteria supporting imminent dangerousness, Defendants continued to enforce custodial restraint.

293.  Even if the Baker Act process was lawfully initiated, Defendants thereafter misused that process for collateral objectives unrelated to its statutory purpose, satisfying the elements of abuse of process under Florida law.

294.  Defendants' continued reliance on unsupported psychiatric characterizations and threats of prolonged confinement after exculpatory findings were documented further demonstrates willful misuse of the custodial process.

295.  After initiation of the custodial process, Defendants committed willful acts using that authority for improper purposes, including denial of prescribed medication and threats of continued confinement unrelated to any lawful emergency objective.

296. As a direct result of Defendants' abuse of process, Plaintiff suffered loss of liberty, confinement, denial of prescribed medication, physical and neurological injury, emotional distress, and economic damages.

297. Defendants' conduct was intentional, malicious, or undertaken with reckless disregard for Plaintiff's rights and the lawful limits of custodial authority.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against SMH and Participating Hospital Defendants liable for abuse of process, and award:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

## COUNT XVIII - BREACH OF CONFIDENTIALITY AND UNAUTHORIZED DISCLOSURE OF CONFIDENTIAL MEDICAL INFORMATION
(Against Defendants CVS Health Corporation, Judy Vu Spica, R.Ph., and Lehem Besera, N.P.)

This claim arises from unauthorized disclosures of Plaintiff's confidential medical information by CVS Health, Spica, and Besera. Spica communicated psychiatric information to law enforcement during the escalation that initiated police dispatch. Besera publicly relayed psychiatric information to responding officers in a CVS parking lot in the presence of Plaintiff's family and other unauthorized persons.

298. Plaintiff realleges and incorporates by reference only those factual allegations necessary to state this Count.

299. At all relevant times, CVS Health, Spica and Besera owed Plaintiff a duty under Florida law and common-law principles to maintain the confidentiality of her medical information and to refrain from unauthorized disclosure.

300. Plaintiff's medication records and psychiatric diagnostic codes appearing in her electronic records constituted confidential medical information protected under Florida law. These entries included psychiatric labels that were disclosed to law enforcement without contemporaneous factual support or necessity.

301. Florida law recognizes a cause of action for unauthorized disclosure of confidential medical information by healthcare providers and entities that create, maintain, access, or transmit patient records.

302. Spica initiated contact with law enforcement and, upon information and belief, reported that Plaintiff was suicidal, resulting in dispatch under a suicidal-person classification. Defendant Besera subsequently communicated to responding officers that Plaintiff was experiencing suicidal and homicidal ideation. These communications occurred in a public parking lot within the presence and audible range of Plaintiff's family and other unauthorized individuals. Plaintiff did not authorize these disclosures and

expressly objected at the time to the disclosure of her confidential medical information.

303. The disclosures included psychiatric diagnostic labels and unsupported characterizations communicated as established fact without contemporaneous necessity for public disclosure.

304. No contemporaneous facts required disclosure of Plaintiff's psychiatric information in a public setting or within the audible range of unauthorized individuals.

305. The disclosures were made to law enforcement in a public location within earshot of individuals not authorized to receive Plaintiff's medical information. Plaintiff did not consent to these disclosures. Spica and Besera communicated these psychiatric characterizations directly to responding officers in circumstances where Plaintiff's family and other unauthorized individuals could hear the information.

306. CVS Health's, Spica's and Besera's disclosures violated Plaintiff's right to medical privacy under Florida law, including the cause of action recognized in Acosta v. Richter, 671 So. 2d 149 (Fla. 1996).

307. Federal privacy regulations, including HIPAA, do not create a private cause of action but inform the standard governing the handling and disclosure of protected health information, which CVS Health, Spica and Besera failed to

85

follow.

308.   As a direct and proximate result of the unauthorized disclosures, Plaintiff suffered humiliation, emotional distress, and reputational harm.

309.   Public disclosure of psychiatric characterizations in a custodial context was reasonably likely to cause humiliation and reputational injury.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against CVS Health, Spica, and Besera liable for breach of confidentiality and unauthorized disclosure of confidential medical information, and award:

(a) compensatory damages, including damages for humiliation, emotional distress, and reputational injury, in an amount to be determined at trial;

(b) punitive damages to the extent permitted by law;

(c) costs of suit and applicable pre- and post-judgment interest; and

(d) such other and further relief as the Court deems just and proper.

**RESERVATION OF RIGHTS**

310.   Plaintiff reserves the right to amend this Complaint to assert additional claims and theories supported by discovery, as permitted by Federal Rule of Civil Procedure 15.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, and award the following

86

relief as warranted by law and the evidence:

(a) compensatory damages, including economic and non-economic damages, in an amount to be determined at trial;

(b) punitive and exemplary damages against those Defendants for whom such damages are permitted by law;

(c) declaratory relief declaring that Defendants' acts and omissions violated Plaintiff's rights under the United States Constitution, federal statutes, and applicable state law;

(d) injunctive and equitable relief requiring correction or annotation of false or misleading entries in Plaintiff's records, including unsupported psychiatric diagnostic entries and related escalation notes that remain in Defendants' records and may be relied upon in future healthcare, custodial, pharmacy, or law-enforcement interactions;

(e) costs of suit, attorneys' fees, and expenses, including pre- and post-judgment interest, as authorized by statute or other applicable law; and

(f) such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby

demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: March 7, 2026
Charlotte, North Carolina

Melissa Italia
Plaintiff, Pro Se
127 N. Tryon Street, Suite 617
Charlotte, NC 28202
melissaitalia@comcast.net
978-854-7952

87

**EXHIBIT INDEX**

True and correct copies of key documents referenced herein are attached as Exhibits A–C.

| Exhibit | Description |
|---------|-------------|
| A | CaroMont Health patient-portal message from Dr. Jacqueline Folks stating that the Major Depression diagnostic code in Plaintiff's medical record was taken from a one-time physician visit in prior provider records, not from an independent clinical evaluation. |
| B | CVS Health electronic medical record entries dated April 27, 2024, reflecting psychiatric diagnostic characterizations and escalation notes relied upon during the events at issue. |
| C | Correspondence from CVS stating that Plaintiff's clinical needs were beyond the scope of MinuteClinic services, together and the handwritten envelope in which the letter was transmitted. |